UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 19-11378-RGS

JENNIFER SALMON

v.

ROGER LANG, et al.

MEMORANDUM AND ORDER ON
DEFENDANTS' PARTIAL MOTION TO DISMISS

December 3, 2019

STEARNS, D.J.

Plaintiff Jennifer Salmon brought this lawsuit against the Chelmsford School Committee, an elected body which appoints the Chelmsford Public Schools Superintendent; Roger Lang, Superintendent of Schools for Chelmsford Public Schools; Linda Hirsch, Assistant Superintendent for Chelmsford Public Schools; John Moses, member of the Chelmsford School Committee; Jason Fredette, Principal of Byam Elementary School within the Chelmsford Public Schools; Kurt McPhee, Principal of McCarthy Middle School within the Chelmsford Public Schools; and Patricia Tobin, Principal of Harrington Elementary School within the Chelmsford Public Schools for

the 2017-2018 school year.[1]  Salmon alleges violation of her First Amendment rights (Count I), defamation (Count II), violation of the Massachusetts Civil Rights Act (MCRA) (Count III), and intentional infliction of emotional distress (Count IV), against defendants in various combinations.  Pursuant to Fed. R. Civ. P. 12(b)(6), defendants Lang, Hirsch, and Tobin move dismiss Counts I, III, and IV, and the School Committee moves to dismiss Count I.[2]

## BACKGROUND

The essential facts, viewed in the light most favorable to Salmon as the nonmoving party, are as follows.  Salmon began as a teacher in the Chelmsford Public Schools in 2002.  Subsequently, she joined the Chelmsford chapter (CFT) of the American Federation of Teachers union (AFT).  While working at Parker Middle School in May of 2016, Salmon was elected president of the CFT.  In that role, she advocated for improved working and environmental conditions in the school.  Thereafter in 2016,

---

[1] Salmon initially named Keri Lorenzo as a defendant, but later voluntarily dismissed defendant Lorenzo from the present action without prejudice.  Dkt # 21 at 1.

[2] Defendants' partial motion to dismiss does not address claims against defendants Fredette and McPhee under Count I, or against defendant Moses under Count II.  Accordingly, the court does not address those claims and associated factual allegations at this time.

Salmon received a lower performance rating than she had in any of her ten previous years as a Chelmsford teacher. After Salmon appealed the low performance rating, it was elevated to "exemplary." Notwithstanding, she requested a transfer to another school. She began teaching at Harrington Elementary School in the 2017-2018 academic year, during which time Tobin served as the Interim Principal.

Salmon heard complaints from other Harrington teachers that "that they did not have sufficient support for students with special needs in their classrooms, and this resulted on occasions with children being left unsafe. Salmon also personally observed this." Compl. ¶ 23. Her colleagues requested that as their union representative, Salmon raise these issues with school leadership. Thereafter, Salmon "advocated for increased staffing and improved monitoring of students to improve the working conditions of her union members as well as to improve the educational environment of students." Compl. ¶ 24. She met at least once with Principal Tobin and Assistant Superintendent Hirsch in October of 2017.

On November 21, 2017, Tobin abruptly canceled a meeting that Salmon had scheduled with her for the following day. On November 22, 2017, Salmon and another union representative went to Tobin's office before the school day began, to reschedule the meeting. The union representative spoke with

Tobin while Salmon sat at a nearby table. Tobin declined to reschedule the meeting, and instead instructed the union representative to speak with "her boss." Shortly thereafter, Superintendent Lang – accompanied by police officers – arrived and instructed Salmon to leave the office. Salmon returned to her classroom. A police officer then met Salmon in her classroom and escorted her out of the school building. Later that day, in a meeting with other faculty members at the school, Lang expressed "that he was 'shocked and disappointed with the actions of some individuals'" and informed those present "that 'there was a right way and a wrong way to get help within the school.'" Compl. ¶ 33.

Late on November 22nd, Salmon received a letter notifying her that she was being placed on administrative leave. The letter informed Salmon that she was forbidden from talking directly to students or staff members. Lang separately informed parents and students in the Chelmsford Public Schools that Salmon was "placed on paid administrative leave pending an investigation into an incident at the school." Compl. ¶ 39. The "incident" does not appear to have been specified. Salmon was prevented from attending a parent-teacher conference for her son, who was a student at the school; she also alleges that she was precluded from taking her sons to and from the school.

Over the following weeks, parents, teachers, and other individuals called for Salmon's reinstatement. More than 100 of them appeared at a December 5, 2017 Chelmsford School Committee meeting to support Salmon, however, only some of Salmon's supporters were able to gain admission. The following day, Lang and Hirsch informed Salmon that she would be reinstated. On December 12, 2017, Lang reprimanded Salmon in writing for insubordination, referencing the November 22nd incident as well as a prior incident involving Salmon's alleged review of a binder containing confidential student information in the school's main office.

Several days later, a School Committee member voiced his belief that Salmon had been placed on administrative leave because of a physical altercation that had taken place on November 22, 2017. In response, Salmon arranged two meetings open to interested members of the union in order to clarify what had happened on November 22nd. At the second of these two meetings, a teacher accused Salmon of lying, and held up printouts of emails that Lang and/or members of the School Committee had allegedly provided to union members "for the express purpose of interfering with Salmon's relationship with her union members." Compl. ¶ 54.

After that meeting, hate mail began to arrive at Salmon's home. Salmon's work environment became increasingly hostile. Neither Tobin nor

Lang took steps to address Salmon's growing concerns. In March of 2018, Salmon took a leave of absence from the school because she had begun to suffer from persistent panic attacks. She was diagnosed with an autoimmune condition in April of 2018, attributable to anxiety and stress.

Salmon requested to transfer to any of three open positions at Byam Elementary School and McCarthy Middle School. The requests were denied, even though Salmon contends that she had the requisite training and experience. Salmon alleges that "McPhee and Fredette [the school principals] denied Salmon's transfer requests because of her past public advocacy on behalf of the union." Compl. ¶ 70. Her later requests to transfer elsewhere were also denied. One school principal rescinded an offer that had been extended to Salmon after learning of the November 22, 2017 incident.

## DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Two basic principles guide the court's analysis. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Second, only a complaint that states a plausible claim

for relief survives a motion to dismiss." *Id.* at 679. A claim is facially plausible if its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

**Count I: First Amendment – 42 U.S.C. § 1983 as to defendants Lang, Hirsch, and Tobin in their individual capacities, and the Chelmsford School Committee in its official capacity**. To state a claim under section 1983, Salmon must plead a prima facie case showing that a person acting "under color of state law" deprived her of a "right[] secured by the Constitution or by federal law." *Santiago v. Puerto Rico*, 655 F.3d 61, 68 (1st Cir. 2011), quoting *Redondo–Borges v. U.S. Dep't of HUD*, 421 F.3d 1, 7 (1st Cir.2005). Proceeding under the federal Civil Rights Act, 42 U.S.C. § 1983, Salmon's Complaint alleges that defendants retaliated against her for engaging in First Amendment activity "by attempting to intimidate her into silence." ¶¶ 82, 83, 85.

Lang, Hirsch, and Tobin. Public school employees cannot be "compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will City., Illinois*, 391 U.S. 563, 568 (1968). At the same time, "in recognition of the government's interest in

running an effective workplace, the protection that public employees enjoy against speech-based reprisals is qualified." *Mercado-Berrios v. Cancel-Alegria*, 611 F.3d 18, 26 (1st Cir. 2010).

Here, Salmon alleges that she lost her job, as well as future employment opportunities that would have otherwise been available to her, as a result of retaliatory actions taken in response to her constitutionally protected speech. Compl. ¶ 86. Salmon alleges that Lang violated her First Amendment rights specifically:

> by directing police officers to take Salmon on a 'perp' walk out of school on November 22, 2017; by issuing an indefinite suspension following the November 22, 2017 incident; by issuing written discipline following the November 22 incident where Salmon only came to the school in her capacity as union president before classes began and before students arrived to ask for a meeting with the principal; by causing emails to be provided, outside the public records process, to union members to interfere with union relations; [and] by not allowing Salmon to speak with her son's teacher or have any interaction with the school during her leave.

Compl. ¶ 82. She alleges that Tobin violated her First Amendment rights by:

> yelling at her on October 13, 2017 for asking for a meeting to discuss working conditions on behalf of the union and, after the November 22, 2017 incident, creating an allowing to fester a hostile work environment based on Salmon's First Amendment activity.

Compl. ¶ 83. She alleges that Hirsch violated her First Amendment rights by instructing a police officer to escort her out of the school on November 22,

2017.  Dkt # 20 at 10.[3]

"[T]he pertinent question in a § 1983 retaliation case based on the First Amendment is whether the defendant's actions would deter 'a reasonably hardy individual[ ]' from exercising his [or her] constitutional rights." *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011), quoting *Agosto-de-Feliciano v. Aponte-Roque*, 889 F.2d 1209, 1217 (1st Cir. 1989).  "Official retaliation is actionable because it 'tend[s] to chill individuals' exercise of constitutional rights.'"  *Clancy*, 632 F.3d at 28, quoting *Powell v. Alexander*, 391 F.3d 1, 17 (1st Cir. 2004).  "Even 'relatively minor events' can give rise to § 1983 liability, so long as the harassment is not so trivial that it would not deter an ordinary employee in the exercise of his or her First Amendment rights." *Clancy*, 632 F.3d at 29, citing *Rivera-Jiménez v. Pierluisi*, 362 F.3d 87, 94 (1st Cir. 2004).

To determine whether an adverse employment action violates a public employee's First Amendment rights, the court employs a three-part test:

> First, a court must determine "'whether the employee spoke as a citizen on a matter of public concern.'"  *Curran v. Cousins,* 509 F.3d 36, 45 (1st Cir.2007) (quoting *Garcetti [v. Ceballos],* 547 U.S. [410,] 418 [(2006)).  Second, the court must "balance . . . the

---

[3] This fact is not alleged in the filed Complaint.  However, in her opposition to defendants' partial motion to dismiss, Salmon requests permission to amend the Complaint to include this alleged fact. Dkt # 20 at 10.  The request is granted, and proceeds on the understanding that an Amended Complaint will be filed.

interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 44 (quoting *Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968)) (omission in original). Third, the employee must "show that the protected expression was a substantial or motivating factor in the adverse employment decision." *Id.* at 45. If all three parts of the inquiry are resolved in favor of the plaintiff, the employer may still escape liability if it can show that "it would have reached the same decision even absent the protected conduct." *Rodriguez–Garcia [v. Miranda-Marin],* 610 F.3d [756,] 765-66 [(1st Cir. 2010)] (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

*Decotiis v. Whittemore*, 635 F.3d 22, 29-30 (1st Cir. 2011).

Defendants argue that Salmon's claim "must fail because at all relevant times, [Salmon] has alleged that she was acting and speaking as Union President and/or as an employee, not as a citizen." Dkt # 13 at 8. In *Garcetti*, "the Supreme Court held that public employees do not speak as citizens when they 'make statements pursuant to their official duties,' and that accordingly, such speech is not protected by the First Amendment." *Decotiis*, 635 F.3d at 30, quoting *Garcetti*, 547 U.S. at 421. If Salmon's "speech was made 'pursuant to [her] official duties,' then [Salmon] has no First Amendment claim, since, generally, '[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties.'" *Gilbert v. City of Chicopee*, 915 F.3d 74, 82 (1st Cir. 2019), quoting *Garcetti*, 547 U.S. at 421-22. Some years after deciding *Garcetti*, the Supreme Court

qualified its holding by stating that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014). The Court clarified that "the mere fact that a citizen's speech concerns information acquired by virtue of his [or her] public employment does not transform that speech into employee – rather than citizen – speech." *Id.*

In determining whether speech falls within the *Garcetti* exception, a court "take[s] a hard look at the context of the speech." *Decotiis*, 635 F.3d at 32 (setting out a non-exhaustive list of factors to consider). The essential fact here is that in her interactions with Tobin, Lang, and Hirsch, and in her advocacy generally "on behalf of the union," Compl. ¶ 18, Salmon was not discharging an official duty of her employment as teacher, but rather her position as a union official. She alleges no facts to suggest that her union advocacy was at all intertwined with her responsibilities as an employee. *See Meagher v. Andover Sch. Comm.*, 94 F. Supp. 3d 21, 38 n.9 (2015) (distinguishing a teacher's participation in a union from a teacher's ordinary responsibilities as an employee). Moreover, there is nothing about Salmon's speech that would have given "objective observers the impression that the employee represented the employer when she spoke (lending it 'official

significance').'" *Decotiis*, 635 F.3d at 32, quoting *Foley,* 598 F.3d at 7-8 & n.9. *See also Meagher*, 94 F. Supp. 3d at 38, quoting *Dahlia v. Rodriguez*, 735 F.3d 1060, 1075 (9th Cir. 2013) ("[T]he fact that an employee is threatened . . . by his superiors for engaging in a particular type of speech provides strong evidence that the act of speech was not, as a 'practical' matter, within the employee's job duties . . . .").[4]

Salmon also alleges facts sufficient to support a reasonable inference that she was speaking on matters of public concern. As the First Circuit has recognized, speech related to union matters "does point in the direction of finding that the speech involved a matter of public concern. Other circuits have weighed union-related speech heavily in the public concern calculus." *Davignon v. Hodgson*, 524 F.3d 91, 101 (1st Cir. 2008).[5]

Parts two and three of the First Amendment inquiry require the court to balance the employer's interests against the value of Salmon's speech, and

---

[4] The two *Decotiis* factors that favor a finding of *Garcetti* speech, "whether the speech was made up the chain of command" and "whether the employee spoke at her place of employment," *Decotiis*, 635 F.3d at 32, do not on this record tilt the balance.

[5] Among other topics, Salmon asserts that she spoke about a concern for students with special needs "being left unsafe" in school. Compl. ¶ 23. The safety of children in public school reasonably may be considered a "matter of . . . concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983).

assess motivations underpinning the employer's actions. *See Decotiis*, 635 F.3d at 29-30. Each of these tasks is best deferred until development of the factual record. Accordingly, the court will deny defendants' motion to dismiss claims against Lang, Hirsch, and Tobin under Count I.[6]

<u>Chelmsford School Committee</u>. Salmon alleges that the Chelmsford School Committee retaliated against her "for engaging in First Amendment activity by attempting to intimidate her into silence . . . by blocking full access to the December 6, 2017 meeting." The court understands that this allegation to refer to the December 5, 2017 Chelmsford School Committee meeting, given Salmon's allegation that the Chelmsford School Committee instructed unnamed persons to change the "maximum occupancy sign outside the meeting room . . . to read 49" rather than 75 – thereby precluding some Salmon supporters from participating in the meeting. Compl. ¶ 44.

---

[6] Defendants argue that they are protected by qualified immunity. Dkt #13 at 12. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "It is not always possible to determine before any discovery has occurred whether a defendant is entitled to qualified immunity, and courts often evaluate qualified immunity defenses at the summary judgment stage." *Giragosian v. Bettencourt*, 614 F.3d 25, 29 (1st Cir. 2010). The court declines to decide the issue of qualified immunity at this early stage, noting that defendants are free to assert qualified immunity after further development of the factual record.

"In Massachusetts, School Committees are considered part of local governments." *Storlazzi v. Bakey*, 894 F. Supp. 494, 506 (D. Mass.), aff'd, 68 F.3d 455 (1st Cir. 1995); *see also* Mass. Gen. Laws ch. 43, § 31 ("The school committee shall consist of the mayor, who shall be the chairman, and six members elected at large."). Municipalities and other political subdivisions of a State cannot claim immunity from suit under the Eleventh Amendment. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 663 (1978). However, "[u]nder § 1983, municipalities can be liable for constitutional violations only if the violation occurs pursuant to an official policy or custom. A plaintiff can establish the existence of an official policy by showing that the alleged constitutional injury was caused by a formal decision of a municipal legislative body, or by a person with final policymaking authority." *Welch v. Ciampa*, 542 F.3d 927, 941 (1st Cir. 2008) (internal citations omitted).

Salmon does not explain the basis of municipal liability on which she is attempting to proceed. Rather, she alleges in a conclusory fashion that "the maximum occupancy sign outside the meeting room was changed to read 49 based on, upon, information [and] belief, the instructions of the School Committee." Compl. ¶ 44. Salmon does not allege that these "instructions" resulted from any formal decision of the School Committee or even an informal custom of stifling public debate by arbitrarily restricting

citizen admission to public meetings. In other words, the allegations of the Complaint are insufficient to support any basis for municipal liability under § 1983. *See Iqbal*, 556 U.S. at 678-679.[7]

**Count III: Massachusetts Civil Rights Act as to defendants Lang, Hirsch, and Tobin**. To set out a claim under the MCRA, Mass. Gen. Laws ch. 12, § 11I, a plaintiff must allege facts to establish that:

> (1) [his or her] exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation, or coercion.

*Davis v. Rennie*, 264 F.3d 86, 111 (1st Cir. 2001), quoting *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 395 (1996) (internal quotation marks omitted). Because the MCRA is not a free-standing tort, a plaintiff must first identify the right being violated – as Salmon claims, her right to be free from First Amendment retaliation. She must then show that the violation was accomplished by "threats, intimidation, or coercion." The proper gauge under the MCRA is the objective "reasonable person" standard. *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 417 Mass. 467, 474-475

---

[7] To the contrary, Salmon did exercise her First Amendment rights. She explains that she spoke at the School Committee meeting, during which time she addressed topics related to "the students' learning environment" and "the teachers' working environment." Compl. ¶ 45.

(1994).[8]

For purposes of the MCRA,

a "[t]hreat" . . . involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. . . . 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct. . . . ["Coercion" involves] "the application to another of such force, either physical or moral, as to constrain [a person] to do against his will something he would not otherwise have done."

*Planned Parenthood*, 417 Mass. at 474.

Here, Salmon alleges that Lang and Hirsch directed a police officer to remove her from the school building. If proven, the alleged facts would amount to intimidation or coercion within the meaning of the MCRA. *See Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 823 (1985) (implied threat of arrest by a security guard qualifies as intimidation or coercion sufficient to meet the requirements of the MCRA). However, whether the allegation that Tobin "berated Salmon and cursed at her over the phone during Salmon's class," Compl. ¶ 26, suggests an attempt at a First Amendment-retaliated threat, intimidation, or coercion requires further factual

---

[8] "The MCRA is intended to provide a remedy coextensive with that of § 1983. Violations of § 1983, however, are not per se violations of the MCRA." *Maraj v. Massachusetts*, 836 F. Supp. 2d 17, 30 (D. Mass. 2011) (internal citation and quotations omitted).

exploration.[9]  *See Bell v. Mazza*, 394 Mass. 176, 183 (1985) (threat "to do anything at any cost," alongside other alleged acts evincing intentional interference with protected property rights constitutes threats, intimidation, or coercion within the meaning of the MCRA).

## Count IV: Intentional Infliction of Emotional Distress as to defendants Tobin, Lang, and Hirsch.

> To sustain a claim of intentional infliction of emotional distress, a plaintiff must show (1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress.  To be considered extreme and outrageous, the defendant's conduct must be "beyond all [possible] bounds of decency and . . . utterly intolerable in a civilized community."

*Sena v. Commonwealth*, 417 Mass. 250, 263-264 (1994), quoting *Agis v. Howard Johnson Co.*, 371 Mass. 140, 145 (1976) (internal citation omitted).

While Salmon certainly alleges conduct that caused her distress, she does not allege conduct that was "beyond all possible bounds of decency" and "utterly intolerable in a civilized society."  Accordingly, Count IV will be dismissed.[10]

---

[9] There is no legally protected right under the First Amendment to be free of another person's rude or even boorish behavior.

[10] Defendants argue that Salmon's claim for intentional infliction of emotional distress is barred by the Massachusetts Workers' Compensation Statute, Mass. Gen. Laws ch. 152, § 24.  In Massachusetts, "a suit for an intentional tort in the course of the employment relationship is barred by the

## ORDER

For the foregoing reasons, defendants' Rule 12(b)(6) motion is DENIED with respect to Count I (claims against Tobin, Lang, and Hirsch only) and Count III, and otherwise is ALLOWED, pending Salmon's amendment of the Complaint to include the fact alleged in dkt # 20 at 10. Salmon will file her Amended Complaint by December 10, 2019.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

exclusivity provision of the [Workers'] Compensation Act, unless the employee has reserved a right of action pursuant to G.L. c. 152, § 24." *Anzalone v. Massachusetts Bay Transp. Auth.*, 403 Mass. 119, 124 (1988). Salmon does not assert that she reserved a right of action pursuant to § 24, nor does she address defendants' arguments related to intentional infliction of emotional distress in her opposition to defendants' partial motion to dismiss. Regardless, because the court determines that Salmon's allegations fail to state a claim for intentional infliction of emotional distress, the court does not address whether an otherwise actionable claim would be barred by the Massachusetts Workers' Compensation Act.