UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 19-11378-RGS

JENNIFER SALMON

v.

ROGER LANG, et al.

MEMORANDUM ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

January 28, 2021

STEARNS, D.J.

During her tenure as a Chelmsford Public Schools teacher, plaintiff Jennifer Salmon vigorously advocated on behalf of her union, pressing school officials on numerous issues, including heating and cooling in classrooms, workplace safety, and the failure to provide compliant Individual Education Plans (IEPs) to students with special needs.  One of Salmon's union forays came to a boil in November of 2017.  Salmon, then a third-grade teacher at Harrington Elementary School (Harrington), requested a meeting with Principal Patricia Tobin and other administrators to protest safety issues in a first-grade classroom.  When the school administrators refused her request, Eric Blanchet, a field representative for the American Federation

of Teachers (AFT), accompanied Salmon to Tobin's office on the morning of November 22, 2017 to demand a meeting.[1]

A "highly-charged altercation" with Blanchet followed, Defs.' Mem. (Mot.) (Dkt # 81) at 1, during which Superintendent Roger Lang and the Chelmsford Police were summoned to the school in an effort to defuse tensions. Although Salmon remained passive and did not emulate Blanchet's behavior, defendants accuse her of "personally set[ting] in motion" the series of events and "play[ing] an important role through her dogged pursuit of the meeting." *Id.* at 1, 8. Salmon was escorted out of the building by a police officer, put on administrative leave, and issued a written reprimand.

Salmon alleges by way of the Second Amended Complaint (SAC) (Dkt # 39) that these disciplinary measures and other negative reactions to her advocacy were taken in retaliation for her exercise of her First Amendment rights. In addition to her federal constitutional claim, brought under the Federal Civil Rights Act, 42 U.S.C. § 1983 (Count I), Salmon brings a common-law claim of defamation (Count II), and alleges violations of the Massachusetts Civil Rights Act (MCRA), Mass. Gen. Laws ch. 12, § 11H

---

[1] Although Salmon attempts to draw a distinction between demanding a meeting and demanding that a meeting *be scheduled*, *see*, *e.g.*, Opp'n (Dkt # 87) at 8, 15, the purported distinction has no bearing on the court's analysis.

(Count III) and the Massachusetts Whistleblower Act, Mass. Gen. Laws ch. 149, § 185 (Count IV).   Defendants Roger Lang, Linda Hirsch, John Moses, Jason Fredette, Kurt McPhee, and Patricia Tobin, who are Chelmsford school administrators and Chelmsford School Committee (School Committee) members, as well as the Town of Chelmsford move for summary judgment.   For the following reasons, the court will allow the motion for all defendants.

## BACKGROUND

Salmon joined the Chelmsford Federation of Teachers (CFT), a local chapter of the AFT, when she was hired as a Chelmsford Public Schools teacher in 2002.  SAC ¶¶ 11-12.  Salmon became President of CFT in May of 2016.  *Id.* ¶ 15.  While teaching at Parker Middle School, Salmon, in her role as union president, raised concerns about classroom temperatures and unsafe working conditions.  Defs.' Ex. B (Salmon Dep.) (Dkt # 82-2) at 72:3-16, 77:12-78:19.  Convinced that the Parker school principal, Jeff Parks, had retaliated against her for her outspokenness,[2] Salmon transferred to a third-

---

[2] As evidence of retaliation, Salmon states that she received a grade of only "proficient" in her annual performance evaluation in June of 2017 (which was changed to exemplary after she filed a grievance) and was separated from her co-teacher.  Defs.' Ex. B. at 76:2-23.

grade teacher's position at Harrington for the 2017-2018 school year.  SAC ¶ 21.

Salmon continued to protest unsafe workplace conditions following the transfer.  When Salmon learned that a first-grade special needs student habitually bolted from the classroom, she emailed Tobin, Special Education Chairperson Patricia Doherty, and the Director of Special Education Amy Reese on November 16, 2017, objecting that the student's misbehavior posed a "major safety concern for . . . students and adults."  Defs.' Ex. E (Dkt # 82-5) at 3;[3] Defs.' Ex. F (Dkt # 82-6).  In the email, Salmon admitted to having consulted the school's Major Incident Binder, Defs.' Ex. F, which contained confidential student information.  Only a student's teacher and his or her service providers were authorized to access the binder.

When Salmon requested a meeting with Reese to discuss the issue, *see* Defs.' Exs. G, I, K (Dkt ## 82-7; 82-9; 82-11), Reese declined on grounds that

---

[3] Salmon argues that defendants "should be prohibited from relying on th[is exhibit] as they asserted attorney-client privilege to protect the investigator's mental impressions."  Opp'n at 6 n.2.  The court, however, had previously (at Salmon's request) ruled that defendants had waived the privilege by producing the exhibit, referred to as the Vasudevan Report, to Salmon without a "clawback" provision.  The court also allowed Salmon an additional two hours to depose Lang about the report and its attached emails.  Aug. 18, 2020 Order (Dkt # 62).  In light of this history, there is no present basis on which to suppress the Vasudevan Report.

student-related matters are not a proper union concern.  Defs.' Ex. J (Dkt # 82-10).  Tobin was willing to meet with Salmon,[4] but not on the date she requested, November 22, 2017.  Defs.' Exs. K, L.  Undeterred, Salmon and Blanchet proceeded to Tobin's office on November 22, 2017, where Blanchet became "agitated and combative."[5]  Pl.'s Ex. 9 (Lang Dep.) (Dkt # 88-9) at 152:17-153:22.  Lang hurried to Harrington when he became aware of what had happened and confronted Blanchet, who "put[] his hands on Lang."  Pl.'s Statement of Material Facts (Pl.'s SOF) (Dkt # 88) ¶ 24.  Blanchet was subsequently escorted from the building by a police officer.  Although Salmon "remained seated at the table during this encounter," Defs.' Statement of Material Facts (Defs.' SOF) (Dkt # 82) ¶ 67; *see also id.* ¶ 52, Lang ordered Salmon home for the day and asked a detective in plain clothes

---

[4] From the record, it appears that Tobin met with Salmon on November 20, 2017.  Defs.' Ex. L (Dkt # 82-12) (email from Tobin following up on a "meeting . . . during [Salmon's] lunch period in response to [her] email request to meet about an issue . . . in first grade").

[5] Exactly what occurred in the confrontation is disputed.  Defendants allege that Blanchet raised his voice and pointed his finger menacingly in demanding that Tobin produce her calendar diary, Defs.' Ex. D (Tobin Dep.) (Dkt # 82-4) at 135:24-136:11; Salmon maintains that Tobin aggressively responded, "who's going to make me?" or "make me."  Pl.'s Ex. 1 (Salmon Dep.) (Dkt # 88-1) at 118:5-119:6.  Defendants also claim that Blanchet took Tobin's cell phone when Tobin walked out of the office and refused to return it to anyone other than Tobin.  Pl.'s Ex. 4 (Blanchet Dep.) (Dkt # 88-4) at 46:2-24, 48:1-17, 53:10-21.

to escort her from the building.  He stated in a subsequent meeting with Harrington teachers that he was "shocked and disappointed with the actions" of "some individuals" and that there was "a right way and a wrong way" to bring issues to the attention of school administrators.  Pl.'s Ex. 10 (Dkt # 88-10) ¶¶ 15-16.

Salmon was then placed on administrative leave.  She was not permitted to attend parent-teacher conferences or drop her children off at the school while the lawyers for the School Committee conducted an investigation.  On the lawyers' recommendation, Salmon was permitted to resume her teaching position on December 6, 2017, but had a reprimand placed in her file for insubordination by persisting "in demanding a meeting" and for accessing confidential student information without permission. Defs.' Ex. V (Dkt # 82-22).

The November 22, 2017 incident became a matter of local controversy. After Salmon was placed on leave, Lang informed parents and teachers of what in his mind had occurred and responded to media inquiries.[6]  Pl.'s Ex. 9 at 201:9-202:23.  The dust-up with Salmon and Blanchet was discussed in hotly debated posts on social media, which included comments from Moses,

---

[6] The media inquiries appear to have been invited by the union.  *See* Pl.'s Ex. 9 (Dkt # 88-9) at 200:18-202:10.

a member of the School Committee.  *See, e.g.*, Pl.'s Ex. 7 (Dkt # 88-7), Defs.'
Exs. S, U (Dkt ## 82-19, 82-21).  On December 5, 2017, a School Committee
meeting attended by supporters of both Salmon and the school
administration became "contentious and heated."  Pl.'s SOF ¶ 54.

Following her return to Harrington, Salmon alleges that teachers
shunned her and loitered outside her classroom.  Tobin questioned Salmon's
presence in certain areas of the school, Pl.'s Ex. 17 (Tobin Dep.) (Dkt # 88-
17) at 137:4-23, and iterated at a staff meeting in January of 2018 Lang's
warning that there was a right way and a wrong way to raise concerns with
school administrators.  A social media post critical of Salmon was posted in
several places around the school.

Feeling persecuted, Salmon attempted to transfer out of Harrington for
the 2018-2019 school year and applied for several vacant special education
positions within the Chelmsford Public Schools.  Defendants Fredette and
McPhee denied her transfer applications for positions at Byam Elementary
School and McCarthy Middle School, respectively.  She filed this lawsuit on
June 21, 2019.

## DISCUSSION

Summary judgment is appropriate when, based upon the pleadings,
affidavits, and depositions, "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[I]n ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## A. Section 1983 Retaliation Claim (Count I)

The elements of a First Amendment retaliation claim (brought here against defendants Lang, Tobin, Hirsch, Fredette, and McPhee) are "(1) whether the employee spoke as a citizen on a matter of public concern, (2) whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public, and (3) whether the plaintiff can show that the protected expression was a substantial or motivating factor in the adverse employment decision." *Barton v. Clancy*, 632 F.3d 9, 28 (1st Cir. 2011), quoting *Curran v. Cousins*, 509 F.3d 36, 45 (1st Cir. 2007) (internal quotation marks omitted).

Here, the court need not address "the logically antecedent question of whether the expression was protected in the first place." *Hennessey v. City of Melrose*, 194 F.3d 237, 245 (1st Cir. 1999).  The parties agree that Salmon's advocacy on union matters is speech protected by the First Amendment.  *See* Defs.' SOF ¶¶ 2-5; Mot. at 5.  However, "[e]ven if the government employee adduces sufficient evidence to convince a court that h[er] speech merits First Amendment protection, [s]he still must introduce sufficient evidence to permit a finding that [her] participation in this protected activity was a substantial or motivating factor behind the adverse employment action." *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 55 (1st Cir. 2003), citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  Salmon does not satisfy this element as to any defendant.

A burden shifting framework applies in determining whether a plaintiff has shown that retaliation was a substantial or motivating factor in an adverse employment action, which in its essence "is simply a question of causation." *Davignon v. Hodgson*, 524 F.3d 91, 106 (1st Cir. 2008).  If a plaintiff "succeeds in establishing this causal relationship, the burden of persuasion shifts to the defendants to prove 'by a preponderance of the evidence,' that the adverse employment action would have been taken 'even

in the absence of the protected conduct.'" *Pierluisi*, 339 F.3d at 55 (footnote omitted).

The question "whether speech was a motivating or substantial factor in the adverse employment action . . . ordinarily belongs to the jury." *Nethersole v. Bulger*, 287 F.3d 15, 18-19 (1st Cir. 2002).  However, the court may enter summary judgment if "(1) the record evidence compel[s] the conclusion that the plaintiff would have [suffered the adverse employment action] in any event for nondiscriminatory reasons, or (2) the plaintiff did not introduce sufficient evidence in the first instance to shift the burden of persuasion to the defendants."  *Pierlusi*, 339 F.3d at 56.

### 1. *Lang and Hirsch*

Salmon alleges that Lang retaliated against her after the heated exchange in November of 2017 by "directing police officers to take Salmon on a 'perp' walk out of school,"[7] placing her on administrative leave, issuing the December 12, 2017 reprimand, "causing emails to be provided . . . to union members to interfere with union relations,"[8] and by "not allowing

---

[7] Salmon also argues that being escorted from the building amounts to a seizure in violation of art. 14 of the Massachusetts Declaration of Rights. Opp'n at 14.  The assertion, however, is irrelevant to her claim of a First Amendment violation.

[8] The allegation that Lang "provided information to detractors in [Salmon's] union, outside of the public records process, to foster dissent"

Salmon . . . to have any interaction with the school during her leave."  SAC ¶ 85.  In moving for summary judgment, defendants argue that the measures taken against Salmon conformed to a "standard protocol."  Mot. at 7.  Salmon responds that this argument is a pretextual, after-the-fact coverup and that summary judgment cannot enter where motive is in dispute.  Opp'n at 13.

"[T]he standard for showing an adverse employment action is lower in the First Amendment retaliation context than it is in other contexts." *Rivera-Jimenez v. Pierluisi*, 362 F.3d 87, 94 (1st Cir. 2004) (internal citation omitted).  Assuming that being reprimanded and involuntarily placed on paid leave constitute adverse actions, *see Delaney v. Town of Abington*, 890 F.3d 1, 8-9 (1st Cir. 2018), Salmon raises an inference, albeit circumstantial, that retaliation was a motive in defendants' decision to discipline her.  While "[t]he mere fact that an adverse action was taken after an employee exercises First Amendment rights is not enough by itself to establish a prima facie case . . . [Salmon] is not required to produce 'smoking gun' evidence of an

---

also appears to be the basis of Salmon's retaliation claim against Hirsch.  *See* SAC ¶ 1.  Defendants argue, and the court agrees, that Salmon provides no evidence to support this theory with respect to Hirsch.  Mot. at 9.  In fact, Salmon does not even mention the First Amendment claim against Hirsch anywhere in her briefing.  *See, e.g.*, Opp'n at 13 ("Lang, Tobin, McPhee, and Fredette Are Liable Under § 1983." (emphasis omitted)).  Accordingly, the court will enter judgment for Hirsch.

employer's impermissible motive to defeat a motion for summary judgment." *Welch v. Ciampa*, 542 F.3d 927, 940 (1st Cir. 2008) (citations omitted).

Given that Salmon has satisfied the required showing of a causal link, under the burden-shifting framework it falls to defendants to come forward with evidence that they would have taken the same action regardless of the element of speech that figured in the November 22, 2017 face-off with the school administrators.  Lang argues that he had Salmon removed from the building to minimize distraction to students, *see* Mot. at 6, and placed Salmon on leave to facilitate an impartial investigation.  Although Salmon complains that the investigation was less than a model of due process (she was not invited to submit documents of her own), Opp'n at 6, she offers no evidence suggesting that the investigators were biased or deviated from standard procedures or that their findings were factually inaccurate.[9]  Lang's subsequent reprimand was also consistent with the investigation's

---

[9] Salmon protests that defendants permitted the School Committee's investigating attorneys to view the same confidential student incident reports that she was reprimanded for accessing, Opp'n at 8, although the relevance of the complaint eludes the court given the different capacities of the actors involved.

recommendations.  *Compare* Defs.' Ex. E at 12, *with* Pl.'s Ex. 15 (Dkt # 88-15).

Moreover, the discipline Salmon received was imposed for misconduct on her part – namely, insubordination in the workplace and her unauthorized access of confidential student information – that had no plausible connection to her role as a union spokesperson.[10]  These instances of misconduct independently provided an "ample nondiscriminatory reason to discipline" Salmon.  *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007).  At bottom, the First Amendment does not immunize workplace misconduct disguised in the name of free speech.  Salmon's acts of insubordination and spying on confidential student records more than justified Lang's measured disciplinary response (whatever his displeasure with Salmon's strident approach) and no reasonable jury could conclude otherwise.

---

[10] Salmon argues that the delay between Tobin learning that she had accessed the Major Incident Binder on or around November 16, 2017 and Lang's disciplinary action following the November 22, 2017 confrontation suggests that Salmon's unauthorized perusal of the confidential records had not "actually been a significant concern of [Tobin's]."  Opp'n at 15.  Regardless of this temporal relationship, Salmon's access of confidential information was not itself protected speech, but rather an independent basis for imposing discipline apart from any disapproval of her advocacy.

### 2. *Tobin*

Salmon alleges that Tobin retaliated by "berat[ing] [her] and curs[ing] at her over the phone" on October 13, 2017 after Salmon raised concerns about working conditions and by fueling a hostile work environment following the November 22, 2017 incident.   SAC ¶ 26; *see also id.* ¶ 86. Defendants argue that Tobin's phone call with Salmon was "simply a genuine reaction by a supervisor to an employee's insubordinate behavior," and that Salmon's discomfort in the workplace was "a natural consequence" of her conduct on November 22, 2017, for which she alone was responsible.  Mot. at 7-8.  According to Salmon, Tobin's "oppositional conduct toward [her] in October and November [of 2017] set in motion the chain of events that caused this hostility in her work environment."  Opp'n at 16.

The court need not resolve the dispute because Salmon has not established any adverse employment action that was taken by Tobin.  Salmon maintains that Tobin called her on October 13, 2017 during class, "yelled at her," and stated that "the principal at Parker [Middle School] had 'warned her about [Salmon].'"  Pl.'s Resps. to Defs.' SOF (Dkt # 89) ¶¶ 13-14, quoting Pl.'s Ex. 2 (CFT Hearing Tr.) (Dkt # 88-2) at 94:5-95:11.  By contrast, Tobin states that she "was stern with Salmon" in response to Salmon's objections to her student placement decisions.  Defs.' SOF ¶¶ 13-14.  Whoever is right

about the tone of the conversation, a contentious telephone call is not an adverse employment action, much less a matter of constitutional import. Isolated "comments by [a] supervisor that were critical of plaintiff[] . . . without more, [a]re too trivial to deter a person of ordinary firmness from exercising First Amendment rights." *Barton*, 632 F.3d at 30, citing *McKee v. Hart*, 436 F.3d 165, 170-171 (3d Cir. 2006).

While "[r]etaliatory actions that are not materially adverse when considered individually may collectively amount to a retaliatory hostile work environment," *Gomez-Perez v. Potter*, 452 F. App'x 3, 9 (1st Cir. 2011) (citation omitted), the alleged pattern of harassment must at a minimum "have a chilling effect on the employee's exercise of First Amendment rights,"[11] *Barton*, 632 F.3d at 29.  Courts apply an objective standard in making this determination.  *See*, *e.g.*, *id.* (analyzing whether an adverse action "would deter a 'reasonably hardy individual[]' from exercising his constitutional rights" (citation omitted)).

---

[11] While the threshold for an adverse action in the First Amendment context is set more generously for plaintiffs than in other contexts, First Circuit "precedent derives primarily from the employment setting, and the standards are thus typically articulated for that context." *Barton*, 632 F.3d at 29 n.19.  In the employment context, the alleged harassment must be "severe or pervasive" to amount to an adverse employment action.  *Gomez-Perez*, 452 F. App'x at 9, quoting *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 40 (1st Cir. 2003).

Even seen through a collective prism, Salmon's evidence of a pervasively hostile environment comes up short.  Apart from the angry October 13, 2017 phone call with Tobin, Salmon alleges that Tobin posted in her office a "scathing" email from the CFT Vice President written in support of Salmon, Pl.'s Ex. 17 (Dkt # 88-17) at 169:6-170:6, questioned Salmon about her doings in areas of the school outside of her classroom, made veiled remarks in a staff meeting in January of 2018 about the "proper way" to raise concerns with school administrators, and requested that other teachers keep an eye on Salmon's conduct.  Pl.'s SOF ¶¶ 61-62, 64-65.  Salmon also argues that Tobin's "oppositional conduct" led other teachers to berate, ogle, and ignore her and caused someone to display social media posts critical of Salmon in school buildings.  *Id.* ¶ 64; Pl.'s Resps. to Defs.' SOF ¶ 81.

While taken together these actions reflect fractiousness and tension within the school community, they do not meet the legal test of a hostile work environment.  *Cf. Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (a plaintiff may recover on a hostile work environment theory under Title VII when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." (internal citation and quotations omitted)); *Gomez-Perez*,

452 F. App'x at 8 ("[N]either extreme supervision and snubbing, nor increased criticism, will satisfy the adverse employment action prong." (citations omitted)); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (observing that federal laws banning retaliation do not create "a general civility code for the American workplace" (quotation omitted)).  Nor has Salmon offered any evidence that Tobin incited other members of the school community against Salmon.  "[T]oleration of harassment by other employees" may constitute an adverse employment action, *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 19 (1st Cir. 2002), but Salmon provides no evidence that she brought any actionable mistreatment to the attention of Tobin, or that Tobin ignored such reports.

### 3. *Fredette and McPhee*

Salmon alleges that Fredette and McPhee retaliated against her by denying her transfer applications to open positions at their schools.  *See* SAC ¶ 87.  In moving for summary judgment, defendants argue that Fredette and McPhee "denied each position based on their individual assessments of Plaintiff's interview performance, certifications and teaching experience."  Mot. at 9.  Salmon responds that "a reasonable jury could . . . infer that they . . . opposed Salmon's activities" because they attended the December 5, 2017 School Committee meeting and deviated from "established policy" favoring

internal candidates for vacant teaching positions in denying Salmon's sole transfer applications.  Opp'n at 16-17.

While refusing to transfer an employee may qualify as an adverse employment action, *see Rutan v. Republican Party of Ill.*, 497 U.S. 62, 79 (1990), Salmon does not provide sufficient evidence of causation to withstand summary judgment.  The association that Salmon attempts to draw between Fredette and McPhee attending a meeting to "blindly support[] [their] colleagues" and having a retaliatory motive towards Salmon for speech that did not involve their schools are dots that defy connection. Opp'n at 16.  In any event, even if Fredette and McPhee improperly grouped Salmon's applications with external candidates,[12] this error does not raise an inference of retaliation.   Disputes over employee promotions or hiring choices, absent some strong showing of a discriminatory motive, are not areas into which a court is lightly to tread.  As the First Circuit has cautioned,

---

[12] The agreement between CFT and the Chelmsford School Committee that Salmon cites as evidence of a deviation from "[t]he standard policy and procedure [that] calls for all internal transfer candidates to receive full considerations before any external candidates," Opp'n at 9, does little to advance her argument.  The agreement provides a "first priority" right to "designated employees," following which "the school department may hire outside applicants."  Pl.'s Ex. 20 (Dkt # 88-20) §§ 10-03(g) & (j).  However, Salmon did not apply to transfer as a "designated employee."  *See id.* at § 10-02(b) ("Employees are 'designated' when there is a decrease in the number of classes of a particular grade and/or subject area.").

a court does not sit as a super personnel department second guessing the merits – or even the rationality – of an employer's nondiscriminatory business decisions. *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991).

## B. Massachusetts Civil Rights Act (Count III)

Because Salmon's MCRA claim implicates the same First Amendment right underlying her § 1983 federal civil rights count, *see* Opp'n at 20-21, it also fails to withstand summary judgment. Defendants maintain, and the court agrees, that "[t]here is no underlying independent actionable right created by the MCRA" that would apply in this (or any other) case. Mot. at 11.

The MCRA creates no substantive rights. *See Mouradian v. Gen. Elec. Co.*, 23 Mass. App. Ct. 538, 543 (1987). As under 42 U.S.C. § 1983, the MRCA's federal analog, "a plaintiff must assert the violation of a federal [or state] right, not merely a violation of federal [or state] law." *Perkins v. Commonwealth*, 52 Mass. App. Ct. 175, 181 (2001), quoting *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). Because the MCRA is not intended to create "a vast constitutional tort," redress is "explicitly limited" to situations "where the derogation of secured rights occurs by threats, intimidation or

coercion" involving a harm "directed toward a particular individual or class of persons." *Bally v. Northeastern Univ.*, 403 Mass. 713, 719-720 (1989).[13]

Most cases decided under the MCRA involve a factual element of physical confrontation or force, though "in certain circumstances, economic coercion, standing alone, may be actionable under the act." *Buster v. George W. Moore, Inc.*, 438 Mass. 635, 648 (2003). Here, there is no evidence of any economic penalty exacted from Salmon, and no evidence of physical intimidation or coercion. As the Supreme Judicial Court has held, to be actionable, a defendant's actions must amount to "an attempt to force someone to do something the person is not lawfully required to do." *Freeman v. Planning Bd. of W. Boylston*, 419 Mass. 548, 565 (1995). While defendants may have exhibited hostility to Salmon's aggressive advocacy, there is no evidence of any attempt to prevent her from speaking her mind or deterring her from discharging what she believed were her duties as a union official. As Salmon cites no conduct on the part of

---

[13] For purposes of the MCRA, a threat "involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm"; intimidation "involves putting in fear for the purpose of compelling or deterring conduct"; and coercion entails "the application to another of such force, either physical or moral, as to constrain [a person] to do against his will something he would not otherwise have done." *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474 (1994).

defendants that would satisfy the "threats, intimidation, or coercion" element of the statute, her state civil rights claim fails.[14]

## C. Massachusetts Whistleblower Act (Count IV)

As the basis for her Whistleblower Act claim against the Town of Chelmsford, Salmon alleges that McPhee and Fredette retaliated against her "written disclosures to Lang and the School Committee . . . regarding the [classroom] heating issues" by denying her transfer requests.  Opp'n at 21; *see also* SAC ¶ 88.  The Whistleblower Act provides that "[a]n employer shall not take any retaliatory action [including discharge or suspension] against an employee because the employee . . . [d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes is in violation of a law . . . ."  Mass. Gen. Laws ch. 149, § 185(b)(1).  In the first instance, Salmon cannot show a causal relationship between the denial of her transfer applications and her 2016 complaints about heating in her school.  More to the point, there is no plausible argument that her complaints about HVAC problems in her school

---

[14] The case on which Salmon relies, *Reprod. Rts. Network v. President of the Univ. of Mass.*, 45 Mass App. Ct. 495, 506-509 (1998), is not on point. In *Reproductive Rights*, the University squelched plaintiffs' attempt to organize on behalf of abortion and gay rights by locking the building where plaintiffs were to hold their forum and then sealing off the premises by stationing seventeen police officers around the perimeter to prevent anyone from entering.

amounted to a disclosure of an employer practice "in violation of law." Consequently, the claim cannot survive.

### D. Defamation (Count II)

Salmon's defamation claim against Moses is premised on his social media comments concerning the November 22, 2017 confrontation with Tobin and Lang.  SAC ¶ 78.  A defamation claim requires a plaintiff to establish that "the defendant was at fault for the publication of a false statement regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either caused economic loss or is actionable without proof of economic loss."  *White v. Blue Cross & Blue Shield of Mass., Inc.*, 442 Mass. 64, 66 (2004).  "[A] threshold issue is whether the statement is reasonably susceptible of a defamatory meaning, and that determination is a question of law for the court."  *Foley v. Lowell Sun Publ'g Co.*, 404 Mass. 9, 11 (1989).

According to Salmon, Moses made three false statements on social media.  Opp'n at 19.  First, Moses stated that Salmon called Tobin a "coward."  Pl.'s Ex. 7.  Salmon clarifies, however, that what she had in fact written in an email copied to Tobin was that *Reese's* "unwillingness to have a conversation about solutions is cowardly."  Defs.' Ex. K.  In a world where all do not speak with the precision of an Oxford don, the distinction at best lies mid-spectrum

between a quibble and a cavil.  "[A] statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson v. New Yorker Mag.*, 501 U.S. 496, 517 (1991).  Thus, "when a statement is substantially true, a minor inaccuracy will not support a defamation claim." *Reilly v. Associated Press*, 59 Mass. App. Ct. 764, 770 (2003).  Moses's statement is inaccurate insofar as he mistargets the actor who Salmon labeled "cowardly," but this misdirection would have no bearing on a reader's understanding of Salmon's contempt for the defendants.  *See Jones v. Taibbi*, 400 Mass. 786, 795-796 (1987).

Next, Salmon alleges that Moses asserted that Blanchet had "assaulted a staff member while children were in school," while in fact the "children were not in school when the incident occurred," and "Blanchette [sic] did not even touch [the victim] Tobin."  Opp'n at 19.  While "defamation can occur by innuendo as well as explicit assertion," *Reilly*, 59 Mass. App. Ct. at 774, Salmon's contention that the statement, which is directed at Blanchet, nevertheless "concern[ed]" her because "she was blamed for bringing Blanchette [sic] into the school," Opp'n at 19, is too far a stretch.  To establish that a statement is "of and concerning" her, Salmon must prove either that Moses subjectively intended to refer to her, or that his words could

reasonably be understood to refer to her.  *See Eyal v. Helen Broad. Corp.*, 411 Mass. 426, 430-431 (1991).  "[I]f the person is not referred to . . . in such manner as to be readily identifiable . . . extrinsic facts must be alleged and proved showing that a third person other than the person [defamed] understood it to refer to him."  *HipSaver, Inc. v. Kiel*, 464 Mass. 517, 528 (2013), quoting *Brauer v. Globe Newspaper Co.*, 351 Mass. 53, 56 (1966).  Moses's statement was clearly directed to Blanchet without any tangential implication that Salmon was responsible for his behavior.

Salmon's final instance of a defamatory statement also does not survive summary judgment.  Moses wrote that the "Union has no rights for administrative process, or to confidential information.  And in demanding it an [sic] not following the rules there was actual, real danger . . . ."  Pl.'s Ex. 7.  The statement on its face has no defamatory meaning and is nothing more than a strong expression of opinion.  While Salmon insists that there is no evidence that she personally demanded confidential information, Opp'n at 19, the statement that the union had no right to seek it is demonstrably true.

## ORDER

For the foregoing reasons, the court <u>ALLOWS</u> the motion for summary judgment for all defendants.  The clerk will enter judgment accordingly and close the case.

SO ORDERED.

/s/Richard G. Stearns_____
UNITED STATES DISTRICT JUDGE